And we'll take up Lawrence v. Medtronic Lawrence v. Medtronic I want to express my appreciation for the court for taking this case. Keep your voice up, would you, counsel? It's a little bit difficult to hear you. Right. My name is Leon Ozuran for Plaintiff Appellant Rebeca Lawrence. I would like to reserve five minutes for rebuttal. All right. I want to briefly remind the court what it's all about. We're dealing with an elderly patient with extreme level of pain. If I can stop by one second. She suffers from conditions called Prince Metal Angina. In 2009, her doctor, Lumba, prescribed her a device, opiate pumps, made by Medtronic, which is the largest producer of medical devices in the world. It also produces heart simulators and some other things. Dr. Lumba implanted that device during the surgery in 2009. In 2014, that pump went bad. Plaintiff came to Dr. Lumba. They called a... Mr. Ozuran, can I ask you a factual question? Right. Sure. I was looking to see if there was some specific allegation in your complaint as to what you claim was a defect in the pump. Was there a faulty valve or was there a faulty suction device or was there a faulty insertion coupling with the catheter? I couldn't see that you've alleged what was wrong with the pump. Can you tell me that? Yes, sir. That is a major issue in this case. I imagine it is. Yes, it is. But the problem not with the defects. If you... Let's say we don't have... We never had a possession of the device. It's been explanted from my patient, from my client in a surgical procedure. It's by hazard. It's never... She was unconscious. We never touched the device. She never had a possession. But the point is not this. It doesn't matter what the problem with the device was. If we... Let's say we have it and we discover the pump was bad. Are you claiming that this device was defective because it misfunctioned in a manner that a reasonable patient would not expect? No. That's California product liability law. Right. You're not basing your claim on that. No. All right. The problem, if we discover the defect, any defect within a product, technical nature, would be covered by PMA exception, preemption. We would not be able to prosecute the case because it would fall directly under PMA preemption covering all technical defects and all design defects and everything with the devices. It's a very interesting issue. Federal government gave PMA protection saying it doesn't matter what's wrong with the defect. As long as Medtronic will follow the procedure, analyzing defects, recording, providing improvements, reporting, and everything else, it's a carte blanche, indemnified. You have no liability as long as a procedural structure will be obtained. What we have here is not an issue of a defect. We cannot... To cut to it, you're claiming violations of the law, including the failure to report the adverse effects in order to get around preemption of the claims. We're not getting around the preemption. Okay. I don't mean to imply anything. I'm just saying you're not claiming an actual defect. You're claiming violations of the regulations which are not preempted. Exactly, Your Honor. Exactly. If we would claim the defect, they would be preempted. We cannot sue on that premise. Right. So you're claiming failure to report these adverse effects and then also fraud based on the failure to file the adverse event reports. FDA issued numerous, numerous conditions upon which PMA was granted. As a matter of fact, PMA conditional approval letter is attached in excerpts. And the most important part, FDA said, you must follow the procedure, reporting every 30 days, every one year. You have to analyze, fix it, because FDA understood there's going to be victims, people might die, but it would be acceptable price to pay for improving device for future use. So they're saying, we forgive you, we give you carte blanche, we don't want you to be sued to extinction by lawyers for failing devices. We're going to give you preemption as long as you follow the procedure. And here is a unique case, because what we have here is a prima facie of something going on. Four devices were implanted. Three were removed. None of them were received allegedly by Medtronic. None of them. To that effect, when I requested what happened with the devices, very simple question. What happened with pumps? Three pumps were supposed to be sent to Medtronic for analysis. Your claim is that Medtronic should have reported the adverse event of the removal of the three pumps to the FDA. It should have acknowledged receipt, should have analyzed, fixed, and make a report to FDA. But your client knew about the adverse event because it didn't work with her. This is another issue, because it was. It was partially. It's true that it was. I'm going to talk about assumption of risk in a second. I want to make points. I think Judge Bay is talking about reliance, like if you're going to prove I'm a fraud client. Exactly. It's another thing that we're talking about. I don't think it's fair to request similar, to place terminal burden as an assumption of risk or reliance on the people with the medical devices. It's different, much different from a person who went to buy a coffee maker. Coffee maker, person come to the store, choose, pick the model, and the salesman says, okay, we'll give you 30 percent because this knob doesn't work. Person comes home, coffee maker doesn't work, that could be assumption of risk. What we're dealing here is a person come to the doctor, know nothing, excruciating pain, all she's saying, doctor, help me out. Doctor is the one who knows about those devices, models, performance, statistical reliability and everything. And the doctor is the one who picks the device suitable for that patient. After first, which is exactly what happened, Dr. Lumba inserted device. Next time in 2014, client again came to doctor, said device not working. And again, Dr. Lumba said, let's pick the Medtronic, and client says, listen, it failed. Dr. Lumba says, it's been improved. It's, you know, four years, five years past, they improved the model, it's not going to fail this time, very rare. Mr. Ozarian, let me see if I can understand your point. You're claiming that if these adverse events had been reported to the FDA, your client would have learned about that and would have stopped using them? Not really. Not really that. This is too remote. Because she knew they didn't work, but if it had been reported to the FDA and the FDA had published the adverse event, is it your allegation that that FDA imprimatur of the official fact that it would have changed your client's actions? Not the way you phrase it. The reporting to FDA is really irrelevant for my client. It's too remote. But what my client wanted and hopefully would happen, let's say first pump failed. They would analyze and they would probably do something, hopefully they fixed the defect. So maybe not on a second, but on a third pump, it is possible that that pump would be fixed and that happened, and that failure again would not happen. We're dealing with a continuum of failing. And those pumps were never acknowledged, never fixed, never analyzed. So the whole purpose of PMA was to find the defects and fix it. And Medtronic, and I believe intentionally, chose the practice of hiding pumps so his reliability statistic would be almost 100%. Counsel, would you help me here? Sure. You're saying that they violated federal regulations. As I understand it, there's not a specific regulation that says you have to analyze explanted pumps. No, Your Honor, you're wrong on this. Well, then enlighten me, but just let me finish the other part. There is a regulation, a requirement to report adverse events. And you say they didn't. They say they did, that SCR 45 through 56 are those adverse event reports. So can you help me with number one, why are they wrong about saying they did report them? And then secondly, the part about requirement to analyze. First of all, I don't believe they reported this. If you're referring to MAUDI report as a public website, that's not reporting. I'm just looking at SCR 45 through 56 that's in the record that are very complex, but they're headed adverse event reports, and they claim that those are the adverse event reports. So tell me why they aren't. Is it the MAUDI reports, like the small things? I'd address that. I think it's all misleading, and I believe it's, if anything, it's fraudulent upon this Court to present it. It's not what the Title 21 requires. How could they, just simply put, if they say, and I have affidavit of her head of the Consumer Custom Relations Department, which is in charge of accepting and fixing, analyzing defective pumps, how could they, I have on the penalty of perjury declaration, Lisa Woodward, page attached to 49, unequivocally saying, we never receive anything, we don't have a record of anything. It's page 49 of the excerpts. So how could they report anything? And the reports which you're referring, as far as I remember, I did not expect that to come up here. It was prepared in 2016, if anything, after the lawsuit had already been filed. And they retroactively putting some kind of a date on a public website. It's nothing but to obfuscate and basically mislead this Court. We have an unequivocal statement, repeated not only by declaration of the penalty of perjury, but in previous conversations. The pre-filing, before the lawsuit was filed, I talked to Rafi Faktouri from Chicago office, representing Medtronic, and he sent me a letter in which he's saying, we don't have the pump. Do you have the pump? I said, how could we? He said, oh, without pump, you won't be able to prove defect. I said, Rafi, what are you talking about? That's a restricted product. You should receive explanted pumps and analyze it. Dr., did you somehow talk to her doctor and see whether the doctor sent the pumps back to Medtronic? First of all, I extensively had a conversation, numerous, for years with Dr. Lumba. First of all, he never possessed the pump. He explanted, as far as his testimony on the penalty of perjury, he gave it to the nurse and to Brian Coleman, who is a regional agent of Medtronic. Brian Coleman is specifically supposed to be present in the surgical room to receive those pumps as soon as they get implanted so he can assure the delivery to Minnesota for analysis and examination. In his declaration, in his deposition, I believe it's on page 5, it's attached to the report, he's saying, look, the first pump, what seems to be about five and a half years out of seven, which is life expectancy, we didn't feel it's needed. If Dr. ordered, we might send it. Second pump, I don't know what happened. Third pump, I put it in the FedEx box. We're talking about restricted product, and this leisure fair attitude, it's another violation of federal requirements. We know for a fact that at least in this instance, at least in this case, the reporting requirements were violating. Requirements requiring analysis and report to FDA were violating. It's not the point that my client would benefit from reporting to FDA. My client would receive it, that pump would be finally fixed, and she wouldn't be implanted with the same pump again and again, knowing that it's a defect exist. But again, it was for the doctor to analyze. What happened is it's called learning intermediary. It's supposed to be the doctor protecting a client for his well-being. In fact, when we cannot claim that we are detrimentally relying on this product, it works as a protection of the wrongdoers. They're doing defective products, they're making defective products. But because my client is dealing with a doctor, not with the manufacturer directly, she cannot, you know, assert detrimental reliance or assumption of risk is improper. Again, comparing to Toaster, she's not in direct privity with the manufacturer. She precluded from dealing directly by the doctor, who is the only one who basically she'll listen to. And if doctor said it's been fixed, it's going to work fine, she takes his word. She's not really challenging her doctor. She has no knowledge, otherwise she has no way of learning any statistical data at all. I didn't quite get the answer to Judge Wardlaw's question to you. Do you claim that the federal regulations require these pumps to be analyzed and report of the analysis to the FDA? Absolutely. If so, could you give me the basis of that claim? All right. I'm reading here. It's 21, aftermarket approval of the subject device's reporting requirement, C21 U.S.C. 360i, paragraph 360i, including obliging companies to inform the FDA of the new clinical investigation or specific scientific studies concerning the device. It's attached to the Department 21, here it is, another. A clinical investigation of scientific studies concerning the device, which applicant knows or reasonably should know, 21 CFR paragraph section 814.84B, subsection 2, and to report incidents in which the device may have caused or contributed to death or serious injury or malfunctioned in a manner that would likely cause or contribute to death or serious injury if it's recurred. Under paragraph section 803.5A. So, Counsel, you wanted to save five, and you're down to three minutes for rebuttal. I will wait for the rebuttal. Good morning, Your Honor, and may it please the Court. Alana Eisenstein on behalf of the defendant, Apelli Medtronic, Incorporated. Your Honor, as the argument that opposing counsel just gave demonstrates, this case is substantially narrowed from what it might have seemed from either the pleadings or even the briefing at this point. But this case is not about, it is not about a product defect. The counsel has said repeatedly, both in his reply briefing here today, that he does not... Could you comment, please, on Mr. Ozarian's citation to a federal regulation which requires Medtronic to analyze the malfunction of a pump and report the result of its analysis? Right. So, counsel, I think, grossly misstates the obligation under federal law, for that matter, whatever California state law might require in terms of analysis of the pump. There is no federal requirement that Medtronic analyze post-explant the pumps, nor could it, because the pumps belong to the patient, and they're explanted by a doctor in a hospital. And contrary to what counsel just said, that a Medtronic representative must be present at the time of explant, that's simply not the case. Sometimes, on occasion, a Medtronic representative will be on hand at the time of explant. But was Dr. Coleman on hand? Because I guess the latest order on review is the dismissal of claims against Dr. Coleman. Right. So Dr. Coleman was on hand, I believe, for one or two of the procedures. Not, I don't think, in the operating room itself, but on hand. And in one case, he testified that he had the pump, and then he FedExed it back. And, true, we don't know or understand what happened to that pump. But I want to be clear, as a matter of federal regulation, not the misrepresentation in state fraud claims, but a matter of federal obligation under either the PMA specific to this device, or the regulations that were cited just now by counsel, none of those regulations impose an affirmative obligation or duty on the company to analyze a device that has been explanted from a patient. Is the controversy that those regulations, if you had done studies, would have required you to report them? Absolutely, Your Honor. That's a good answer. But what about the back and forth about these maud, the pages I was citing, which you seem to say these are exactly what we need, and he seems to say, yeah, there's long afterward, and they're only on a website, and so on. Can you try to help me sort out that fight? Judge Fox would be happy to do that, because I think it highlights the confusion at issue between what an adverse event report is. An adverse event report does not depend on some analysis, necessarily, of the pump. You're right, if an analysis were undertaken and it revealed some kind of defect or problem in the pump, it would need to be reported in an adverse event report. But these adverse event reports can come in based on any type of information. It could be a call in from a patient. It could be a report from a doctor. It could be the kind of report that's here, which is the information coming from the sales representative, or it could even be from a lawsuit. In fact, our adverse event reports were updated based on the lawsuit that was filed here. So it doesn't require an analysis of a pump or possession of the pump by Medtronic to effectively discharge its duties to make adverse event reporting under the federal regulations. Now, the federal ---- Am I right that the pages I was citing are what you claim to be the required adverse event reports? That's right, Your Honor. So the pages from ---- They're very, you know, they're sort of stuck together. So I was trying to figure out how many adverse event reports are there. So, Your Honor, in the excerpts of the record, there are three adverse event reports corresponding to each of the pumps. But I should note that in the district court record, and this was a mistake on our part in the supplemental record, there's actually one more adverse event report. So there's actually four adverse event reports that were contemporaneously filed within the 30 days that are required. Those all within SCR 45 to 56? The three of them are, and the one was in the district court record and was inadvertently, because it was filed on the same day, actually, on December 29, 2014, was inadvertently left out of the appellate record but was filed in the district court. But you tell me if I sort these out correctly, are they distinguished by being Exhibit E, Exhibit F, and Exhibit G, or ---- That's correct, Your Honor. All right. Because then after that, there's also an Exhibit B and Exhibit A. Are those something different? Yes. Because I kept counting five because of those exhibit names. Right. So I believe that Exhibit B constitutes the reference or evidence of the PMA, grant of the PMA. So if I want to count three, it's Exhibit E, Exhibit F, and Exhibit G. Correct, Your Honor. Okay. Thank you. And I just want to clarify one more point of confusion. In the reply brief in here today, counsel represented that these reports were filed after the fact and only in response to litigation. That's simply not the case. The relevant code field in these exhibits is the date FDA received, not the report date. The report date is something that can reference additional reports and supplements to the report. But the initial report is this date FDA received, which is 12-29-2014. Now, the MAUD database is FDA's public reflection of what adverse event reports were filed. It's not the adverse event reports themselves. There's a form that the manufacturer is required to fill out that has the same content of the information. And then the FDA reflects it back in the MAUD database for the public to be able to review and investigators to be able to review and, indeed, lawyers to be able to review. So this MAUD database is the official government report to the public, but it isn't the actual report that the manufacturer makes. That's a separate form submitted. And in each case, Medtronic submitted these contemporaneously at the time or within the 30 days. And so if I dig deep into this, I see a date received of 12-29-2014 for exhibit E. Right. 8-26-15 for exhibit F. And 8-31-15 for exhibit G. Is that what you're relying on? That's correct, Your Honor. And so those reports were made on a timely basis. There's no evidence that Medtronic was hiding the adverse events with respect to the plaintiff and that the fact that the pumps were not analyzed is not evidence of any kind of violation of federal requirements. And I also want to just talk about the purpose of adverse event reporting for a moment. Counsel suggests that even if there were some deficit in the adverse event report requirements, that that would be a way in which Medtronic was trying to skew the performance rates that these pumps experience. That is not the case. An adverse event report is not a measure of performance rates or performance for the product. There's a controlled study, and it's here in the record, the Product Performance Review, where there's a controlled study with thousands and thousands of pumps that determine the performance rates, and that's where the 99-plus percent rates come from. There's no allegation that that controlled study was in any way problematic in this case. The adverse event reports, as I've described to you, the process are anecdotal reports, and they're a way in which both the public and the FDA can get potentially a signal if there's a new trend or something new happening. But what was going on with Lawrence's pumps that inspired the adverse event report and required them to be taken out and replaced? So let me break that down, Judge, between what required them to be taken out and what required the report. The reporting threshold is very low. Basically, any time there is some kind of adverse event, some kind of injury, some kind of problem with the device, federal report must be made. So that threshold is extremely low. What led to the replacement of the pumps? This case sounds very bizarre because there are four pumps in a very short time window, but keep in mind that of those four pumps in the record, there's really only one pump that had an identified failure, which was pump two. So pump one lasted the duration that it was expected. Pump four, at least as of the last record check, was working properly. It was the last pump she got. Pump two was the one that after just a couple of weeks didn't seem to be working. But as counsel admitted, there's no reason to believe or no necessity or even pleading that this was due to a defect. And there's lots of reasons why pumps might not work in the body. When you implant a pump as a sensitive device, it can not work if it were exposed to heat, cold, an electromagnetic field, was implanted wrong, upside down, not inserted correctly. There could be many, many reasons that are not based on a manufacturing defect or anything the manufacturer did that can cause a pump not to function as intended. So we don't know the answer to that, and he hasn't pleaded or based his claim on pump two, on a defect inherent in pump two. Now pump three, which was also explanted after only six months, the doctor in his deposition admitted he didn't know what was wrong, or even if there was something wrong with the pump. There were discrepancies in the amount of medication that were in the pump, but he never identified a malfunction even, much less a defect in the pump. He just made a decision based on his reading of the medication levels that it would be worthwhile to explant the entire system, which is not just the pump, but also the catheter that goes into the spinal column, and replace it again. So that was not because of an identified failure of the pump even. It was the doctor decision-making without any data to support that the pump was not working as intended. And in fact, the data showed that the motor, which was the problem supposedly with the second pump, was functioning in pump three. So I think that even though it seems like on the face of it, wow, there are a lot of pumps here in a short window, much less than you would expect, really we only have one pump where there's even a potential malfunction at issue. So I think that that brings us, if you don't have more questions on this failure to analyze theory to the fraud and misrepresentation claims. And keep in mind that these claims went to summary judgment. The plaintiff had the opportunity to develop the record here and simply failed to develop a genuine issue of fact on three of the essential elements of those misrepresentation claims. Essentially, the plaintiff is arguing that there was some promise that the pumps would be better. She's arguing that there was a promise that these devices would be analyzed. And she's alleging that and now claiming, she wasn't really alleging this, but now claiming that the pumps could be fixed, not just analyzed, but could be fixed in time for the new pump to be replaced. And that the pumps were the best. Those were the three allegations, the best on the market, the three allegations. And what the court found was there was no falsity. These are Dr. Coleman, the sales representative's alleged statements, that there was no falsity in these statements, nor did Coleman have the scientific reason to believe that these were false. And there's good reasons for that. The plaintiff herself admitted she didn't think Mr. Coleman lied when he thought the Medtronic pumps were the best. And it appeared that that was a reflection of his actual opinion, as well as the doctor's opinion at the time. The new pump would be better. First of all, that's sort of just an opinion of future fact. But there was good reason for that. The product performance studies show that these are very reliable pumps. They rarely break. They have over a 99% effectiveness rate within their time frame that they are expected to live. And the new pump was better, you know, to the point of Medtronic not doing what it needs to to continually analyze and fix the pumps. In the record, and this is at SER 121 to 128, there's a huge list. It might not have made significance to your honors, but if you look at it, between 2009 and 2014, the FDA approved over 100 supplements to the PMA for this device and, in fact, redesigned the battery to make the battery life better. So there was good reason to think the pump she got in 2014 would be better than the pump she got in 2009 because it had had substantial numbers of improvements during that time. There's also a lack of detrimental reliance. She said in her deposition she admitted she was not relying on the analysis as to each pump. And I'm going to quote here. It says, quote, You weren't relying on any analysis of a pump before you got a replacement pump because you never had it. Answer, correct. It's also at page 111 of her deposition in the supplement excerpts of the record 95 to 96. And so she tried to backtrack on that statement by submitting two days before her summary judgment motion a declaration that contradicted those statements and said that no, what she was really, what Dr. Coleman, sorry, Mr. Coleman said, was that not only that the pumps could be analyzed, but they would be analyzed and that the particular defect it found would be fixed. She changed that in her declaration to say that that was a promise that he made. They would be analyzed and that the defects would be fixed, and that was the reliance. Well, that just simply is inconsistent with her deposition testimony, that she did not rely on any potential for analysis in making the decision. And, of course, it wouldn't have been plausible for her to do that. The short window of time between pump one and pump three wouldn't have even made sense to think you're going to explant a pump and then within three weeks they are going to redesign the pump and get a PMA supplement from the FDA to, if there were a defect, fix the defect. And, of course, we don't have any defect in this case in the first instance. So I think that these claims of misrepresentation of fraud, the district court properly granted summary judgment finding no genuine issue of material fact as to really several of the essential elements of this claim. If there are no further questions, I ask that you affirm the judgment of the district court. All right. Thank you, counsel. Counsel, you have three minutes left. Basically, counsel admitted that they did not comply with the reporting requirements under proper 360 IA 814. Those public reports is not a substitute. And, as a matter of fact, I can allege here that it's nothing but the fraud prepared after the lawsuit being filed just to confuse the issue. I asked during the deposition and during discovery, whatever limit that I had, I asked where did it come from, who prepared this. Nobody can say. I asked Mr. Coleman if he prepared it during the deposition on the penalty. He says he knows nothing about it. I asked again, again and again, Medtronic counsel. They said we don't prepare those ones and nobody knows. What we have is a complete denial of receiving pumps ever by Medtronic. So how could it have been that reported and who reported? It should not be admissible. It should be disregarded. And even if we have that issue, that issue of authentication should be left for trial court. This is a part of the documentation. The documentation should be established genuine or not, authenticity during the trial, not during the appeal presented to this court. On the basic issue, the more important issue, this case was dismissed because the trial court says, again, it's very clear, page 9, last part, the complaint does not allege the defendant failed to comply with FEMA requirement. In fact, the plaintiff admitted she had no idea what the source of the reported defect might be and has little prospect of figuring it out. That is a confusion of court, as I started my presentation, saying basically unless you can point out to the defect, your case would be dismissed because otherwise you cannot prove which FDA requirement was violated. And that is a great misconception because the violation of requirement goes to the statute provision, administrative nature, not technical nature. And we clearly know that at least two cases in two statutes have been violated, 361 and 814-84. I was precluded from conducting any other discovery because the judge dismissed any fraud issues and leaving only two issues of personal misrepresentation. And the personal misrepresentation, come back to that, is basically he said, she said. And that is a tribal issue. Was she relying? Was he promising? What he said? And I want to point out, it was not one pump. So conversation was made during the first replacement or second replacement or third replacement. That is a tribal issue. Just on that basis alone, it should be left for the jury to decide who's telling what and whom to believe. That's not a dismissable under Demer. Second of all, fraud allegations should not be dismissed on preliminary charges, on a preliminary filing, because I was precluded from obtaining any support to my fraud allegation. On the very first motion to dismiss, the fraud charges were thrown out, and all my further attempt to get discovery on anything related to Medtronic was completely blocked based on a dismissal. All I could just do is make a certain limited discovery based on personal presentation or not. And I want to make another point. At least in this case, we know that three pumps were never reported as accepted as adverse event. So all statistical data produced by Medtronic, we know already it's false and very sensitive. One, three additional faulty pumps could skew the entire statistical reliability issue, could trigger reevaluation of the PMA, could lose the market shares of the biggest company in the world. And that is a big, big consequences. I believe it was exactly the strategy accepted at the very top level of management saying we're going to hide adverse events, we're going to deal with them if anything is going to be discovered. But for the meanwhile, we don't have to deal with jeopardized existing PMA, because if we bring too many faulty pumps, they're going to revoke PMA for bad reliability. We're going to lose market shares. All right. So you're over your time. Well, over your second time. I appreciate your attention. Thank you very much. And this case should be remanded. Thank you. Okay, thank you. Lawrence v. Medtronic is submitted.
judges: Boggs, Wardlaw, Bea